Daniel E. Sobelsohn (CSB No. 181212)
daniel@sobelsohnlawfirm.com
THE SOBELSOHN LAW FIRM
16027 Ventura Blvd.
Suite 502
Encino, CA 91436
Tel: (818) 992-7800
Fax: (818) 530-4342

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT CALIFORNIA

ARIANA LOPEZ, individually and as the successor in interest to the Estate of Estela Moreno, GERADO LOPEZ-MORENO, and OMAR ALONSO HERNANDEZ,

Plaintiffs,

v.

MONSANTO COMPANY, a corporation.

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL ACTION DAMAGES:**

| | |
|---|---|
| **(I)** | **SURVIVAL CLAIM FOR NEGLIGENCE** |
| **(II)** | **WRONGFUL DEATH CLAIM FOR NEGLIGENCE** |
| **(III)** | **SURVIVAL CLAIM FOR STRICT LIABILITY DESIGN DEFECT** |
| **(IV)** | **WRONGFUL DEATH CLAIM FOR STRICT LIABILITY DESIGN DEFECT** |
| **(V)** | **SURVIVAL CLAIM FOR STRICT LIABILITY FAILURE TO WARN** |
| **(VI)** | **WRONGFUL DEATH CLAIM FOR STRICT LIABILITY FAILURE TO WARN** |
| **(VII)** | **SURVIVAL CLAIM FOR BREACH OF EXPRESS WARRANTY** |
| **(VIII)** | **WRONGFUL DEATH CLAIM FOR BREACH OF EXPRESS WARRANTY** |
| **(IX)** | **SURVIVAL CLAIM FOR BREACH OF IMPLIED WARRANTY** |
| **(X)** | **WRONGFUL DEATH CLAIM FOR BREACH OF IMPLIED WARRANTY** |
| **(XI)** | **SURVIVAL CLAIM FOR FRAUD** |
| **(XII)** | **WRONGFUL DEATH CLAIM FOR FRAUD** |

**DEMAND FOR JURY TRIAL**

1.    This action concerns the misconduct of the Monsanto Company ("Monsanto" or "Defendant") in selling the herbicide Roundup® to consumers for gardening use, even though it contains glyphosate, which is carcinogenic to humans, and its use is restricted or banned in many states, and countries for that reason.  Indeed, Monsanto has been a defendant in countless cases claiming injury or death from exposure to glyphosate and paid out substantial settlements but continued to sell this dangerous product for regular home use by consumers.

2.    Monsanto, despite being aware of the danger its product posed, put profits before people and sold its Roundup® herbicide to consumers for home gardening uses, knowing that this would result in regular exposure to glyphosate, the known carcinogen that is the active ingredient in Roundup®, and result in its customers developing cancer, particularly, non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

3.    Implicitly conceding that the product is dangerous to consumers, Monsanto's parent company, Bayer AG ("Bayer"), agreed in 2021 to stop selling Roundup® to consumers – but hoping apparently to reap an extra few billion dollars in sales, delayed pulling the product from store shelves until 2023.

4.    Estela Moreno ("Ms. Moreno") worked as a housekeeper tending to other people's homes. When Ms. Moreno was at her own home, one of her favorite activities was tending to the immaculate garden she kept.  Like many home gardeners to whom Roundup® brand herbicide was marketed, Ms. Moreno used the product regularly for over a decade, often every week, with additional applications after rainstorms, to keep weeds and unwanted grasses and plants under control. Unfortunately, because of

misrepresentations and omissions by Monsanto regarding the product's safety, Ms. Moreno did not wear elaborate protective gear and was directly exposed to the carcinogenic herbicide on a regular basis.  Further, because gardening was a leisure activity for Ms. Moreno, she took her time in the garden, tended to her plants by hand, and had direct contact with areas that had been treated with Roundup®.

5.    As a result of this regular and extensive exposure to Roundup®, Ms. Moreno was diagnosed with Diffuse Large B Cell lymphoma, a type of Non-Hodgkin's Lymphoma in 2020, and passed away less than a year later, on March 17, 2021, at the age of 57.  Ms. Moreno did everything possible to fight the disease, including enduring multiple rounds of debilitating chemotherapy.

6.    At the time of her death, Monsanto (now owned by Bayer AG), to avoid responsibility for its wrongful conduct, continued to falsely insist that Roundup® was safe and did not cause thousands of cancer cases.

7.    This survivorship action seeks to hold Monsanto accountable for its conduct that resulted in Ms. Moreno's cancer, loss of enjoyment of life, the debilitating and agonizing cancer treatments, and pain and suffering she endured before and her untimely death at the age of 57 when she had decades of life left as well as decades of earning capacity.  This action also seeks to hold Monsanto accountable for the wrongful death of Ms. Moreno and the emotional hole and suffering that her children have had to endure on account of her untimely passing.

### THE PARTIES

8.    Plaintiff Ariana Lopez is the daughter of Estela Moreno and is proceeding individually with respect to seeking wrongful death damages and as the representative of

the Estate of Estela Moreno with respect to seeking survivorship damages, including pain and suffering endured by Ms. Moreno during her battle against Non-Hodgkin's lymphoma. Ms. Moreno was a resident of the Los Angeles, as is her daughter, Ms. Lopez. Ms. Moreno purchased Roundup® in Los Angeles and used it at her house in Los Angeles.

9.      Plaintiff Gerado Lopez-Moreno is Estela Moreno's son and seeks wrongful death damages. Mr. Lopez-Moreno is a California resident.

10.     Plaintiff Omar Alonso Hernandez is Estela Moreno's son and seeks wrongful death damages. Mr. Hernandez is a California resident.

11.     Defendant Monsanto is a Delaware corporation with its headquarters in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, sold and used in the State of California and employs sales representatives in the State of California. Having engaged in interstate commerce, conducted business in California, sold and advertised its product in California, and targeted California consumers, Monsanto expected or should expect its acts to have consequences within the State of California.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is incorporated and has its principal place of business outside of the state in which the Plaintiffs reside. The amount in controversy between Plaintiffs and

1    Defendant exceeds $75,000, exclusive of interest and cost. The Court also has

2    supplemental jurisdiction pursuant to 28 U.S.C. §1367.

3        13.    Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that

4    Defendant sold, marketed, and/or distributed Roundup® within this district during the

5    relevant time period, and a substantial part of the acts or omissions giving rise to these

6    claims occurred within this district.  Ms. Moreno purchased and used Roundup® in this

7    district.

### GENERAL ALLEGATIONS

        14.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide

10   variety of herbicidal products around the world.   Plants treated with glyphosate

11   translocate the systemic herbicide to their roots, shoot regions and fruit, where it

12   interferes with the plant's ability to form aromatic amino acids necessary for protein

13   synthesis. Treated plants generally die within two to three days. Because plants absorb

14   glyphosate, it cannot be completely removed by washing or peeling produce or by

15   milling, baking, or brewing grains.

        15.    For nearly 40 years, farms across the world have used Roundup® without

17   knowing of the dangers its use poses.  That is because when Monsanto first introduced

18   Roundup®, it touted glyphosate as a technological breakthrough that could kill almost

19   every weed without causing harm either to people or to the environment. Of course,

20   history has shown that not to be true. According to the WHO, glyphosate, the main

21   chemical ingredient of Roundup® is a likely carcinogen.   Despite extensive peer-

22   reviewed research and warnings that glyphosate was a carcinogen, Monsanto assured the

23   public that Roundup® was harmless, championed falsified data as to its safety, and

24   attacked legitimate studies that revealed its dangers.

## A.    The Flawed EPA Approval Process for Glyphosate

16.    The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

17.    Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c) (5) (D).

18.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

19.    The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California. However, the EPA's decision to register Roundup® was based on studies on the active chemical, glyphosate, and not the

formulated Roundup® product, which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, which contribute to the health risks associated with Roundup® exposure.

20.     FIFRA generally requires the registrant, which was Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.

21.     The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. However, the EPA is now in the process of re-evaluating all herbicide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-l.  In order to reevaluate these herbicides, the EPA required the completion of additional tests and the submission of data for the EPA's review and evaluation.

22.     The EPA completed its initial review of glyphosate in early 2015 but delayed releasing the risk assessment pending further review in light of the World Health Organization's ("WHO") finding that glyphosate is a likely carcinogen.  *See* discussion *infra*, Part D.  On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper") detailing the agency's review of a small portion of the existing literature on Roundup®. The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

23.     Immediately following the publication of the 2016 Issue Paper, the FIFRA

**COMPLAINT**
7

Scientific Advisory Panel issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The panel strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that the agency had failed to follow its own scientific advisory panel that issued a report that reviewed the EPA's 2016 Issue Paper and the conclusions therein. That panel strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

24.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E).

25.     However, in so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

26.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.  In 1976, the United States Food and Drug Administration ("FDA")

performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." (A male rabbit obviously does not have a uterus.)

27.     In the second incident of data falsification, Monsanto hired Craven Laboratories to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

28.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

29.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek, from 2000 through the present which minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®.  All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate.

30.     Through these means, Monsanto has fraudulently represented that independent scientists have concluded that glyphosate is safe. In fact, Monsanto paid many of these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent"

experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines.  Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

31.    Beginning in 2011, the Federal Institute for Risk Assessment (BFR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant was able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BFR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BFR.  Defendant has used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendant, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto even filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

**B.    Monsanto Falsely Represents to Consumers that Roundup® is Safe.**

32.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer **than table salt**" and "practically **non-toxic"** to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a. Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

b. And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup® biodegrades into naturally occurring elements.

d. Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

f. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g. Glyphosate's safety margin is much greater than required. It has over a 1,000- fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

i. "Roundup® can be used where kids and pets will play and breaks down into natural material."

33.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics".

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

34.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

35.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

## C.    Evidence of Carcinogenicity In Roundup®

36.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.  On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene, indicating it was a possible human carcinogen.

37.    In 2002, Julie Marc published a study titled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDKI/Clyclin B Activation."  The study found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

38.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation". The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The study noted that "Cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell". Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells".

39.    In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.  The Peixoto study noted that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® products.

40.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should consider the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert, and that Roundup® is always more toxic than its active ingredient glyphosate.

41.    Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, including its adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Ms. Moreno from Roundup®. Defendant knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®. Defendant failed to appropriately and adequately test Roundup®, and its adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Ms. Moreno from Roundup®.

**D.    IARC Classification of Glyphosate**

42.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency that the WHO tasked with conducting and coordinating research into the causes of cancer.

43.    IARC set glyphosate for review in 2015-2016. IARC based on five criteria for determining priority in reviewing chemicals. The substance must have a potential for

**COMPLAINT**
14

direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations.

44.    On March 24, 2015, after its cumulative review of human, animal and DNA studies for over a year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

45.    The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

46.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma and several subtypes of non-Hodgkin's lymphoma, and the increased risk continued after adjustment for other pesticides.  The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

47.    The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic

**COMPLAINT**

Lymphocytic Leukemia (CLL), in addition to several other cancers.

**E.     Earlier Evidence of Glyphosate's Danger**

48.    Even before the new classification by the IARC, Defendant had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

49.    In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay". The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

50.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress".

51.    In 2006 Cesar Paz-y-Mifio published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

52.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong". Yet, despite knowledge to the contrary, Defendant falsely maintains that there is no evidence that Roundup® is genotoxic and that regulatory authorities and independent experts agree that Roundup® is not genotoxic.

53.    In addition to glyphosate and Roundup®'s genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties. Glyphosate and

Roundup®, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma and soft tissue sarcoma. Defendant has known of this association since the early to mid-l980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

54.     For example, in 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic. In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for non-Hodgkin's lymphoma and hairy cell leukemia. The study concluded that glyphosate had the most significant relationship to non-Hodgkin's lymphoma among all herbicides studied with an increased odds ratio of 3.11. In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for non-Hodgkin's lymphoma. The study, which controlled for potential confounders, found a relationship between increased non-Hodgkin's lymphoma incidence and glyphosate.

55.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for non-Hodgkin's lymphoma. This strengthened previous associations between glyphosate and non-Hodgkin's lymphoma.

56.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® is safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

57.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, non-Hodgkin's lymphoma.  Defendant failed to appropriately and adequately inform and warn Ms. Moreno of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing non-Hodgkin's lymphoma.

58.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup® is safe, non- carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

59.     Defendant has claimed and continues to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic.  Monsanto at one point even claimed on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic." *Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.*  The truth is that glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of such products.

## F.     Bans and Restrictions on the Use of Roundup®

60.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC

first announced its assessment for glyphosate in March 2015. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it." France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.

61.    In addition, many states and municipalities in the United States have banned or restricted use of Roundup® and other glyphosate-containing herbicides, because of the health risks such herbicides pose.

## G.    Equitable Tolling

62.    Defendant, through affirmative misrepresentations and omissions, actively concealed from Ms. Moreno the true risks associated with Roundup® and glyphosate, requiring that all statutes of limitation be tolled.

63.    As a result of Defendant's actions, Ms. Moreno was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® exposed her to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

64.    As a result of Defendant's actions, Ms. Moreno was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® exposed Ms. Moreno to the risks alleged herein and that those risks were the direct and

proximate result of Defendant's acts and omissions.

65.    Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup®, Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which Defendant had and continue to have exclusive control, and because Defendant knew that this information was not available to Ms. Moreno or to distributors of Roundup®. Defendant is estopped from relying on any statute of limitations because of its concealment by omission and misrepresentation of the danger Roundup® posed to Ms. Moreno.

66.    Ms. Moreno had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the acts of concealment of wrongdoing by Defendant, Ms. Moreno could not have reasonably discovered the wrongdoing at any time prior. Indeed, Defendant spent enormous amounts of money in marketing, promoting and distributing Roundup®, notwithstanding the known or reasonably known risks.  Ms. Moreno and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment form relying upon ay statute of limitations.

**H.    Estella Moreno's Exposure to Roundup®, Development of Diffuse Large B Cell Lymphoma, and Untimely Death at the Age of 57.**

67.    One of Ms. Moreno's favorite activities was tending to the immaculate garden she kept at her own home in Mission Hills, California.  Like many home gardeners to whom Roundup® brand herbicide was marketed, Ms. Moreno used the

product regularly for more than a decade, applying it throughout her garden and yard as often as once a week, with additional applications after rainstorms.  Ms. Moreno would typically purchase Roundup® at stores near her home and did not use other brands of herbicide.  Ms. Moreno used the product as directed, but because of misrepresentations and omissions by Monsanto regarding the safety of the product, she did not wear elaborate protective gear and was directly exposed to the carcinogenic herbicide on a regular basis.  Further, because gardening was a leisure activity for Ms. Moreno, she took her time in the garden, tended to her plants by hand, and had direct contact with soil and plants that had been treated with Roundup®.  Ms. Moreno's exposure to Roundup® was frequent and extensive, possibly more so than many types of workplace exposures.

68.    As a result of exposure to Roundup®, Ms. Moreno developed Diffuse Large B Cell lymphoma, a type of Non-Hodgkin's Lymphoma, was diagnosed in 2020, and passed away less than a year later on March 17, 2021.  Ms. Moreno did everything possible to fight the disease, including enduring multiple rounds of debilitating chemotherapy.  Even as Ms. Moreno lay dying of cancer, and despite all of the evidence showing that Roundup® was not safe for use, Monsanto continued to insist that Roundup® was perfectly safe and disclaimed any connection between Roundup® use and the development of cancers, including Non-Hodgkin's Lymphoma.

69.    The Diffuse Large B Cell lymphoma that Ms. Moreno developed as a result of exposure to Roundup® resulted in her untimely death at the age of 57.  At the time of her diagnosis, Ms. Moreno was otherwise healthy and looking forward to a long and fulfilling life.  She is survived by her children, who are asserting survivorship and wrongful death claims.

**FIRST CAUSE OF ACTION**

**Survival Action Sounding in Negligence by Ariana Lopez in her capacity as**

**Representative of the Estate of Estela Moreno against Defendant**

**(Cal. Civ. Proc. Code § 377.30 et seq.)**

70.    The foregoing allegations are re-alleged and incorporated herein by reference.

71.    Defendant had a duty to exercise reasonable care in designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, selling, and/or distributing of Roundup® into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable or dangerous side effects or injury, such as cancer.

72.    Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Roundup® into interstate commerce in that Defendant knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of non-Hodgkin's lymphoma.

73.    The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.   Manufacturing, producing, promoting, formulating, creating and/or designing Roundup® without thoroughly testing it;

b.   Failing to test Roundup® and/or failing to adequately, sufficiently and properly test Roundup®;

c.   Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use, in that Defendant herein knew or should have

**COMPLAINT**

known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

d.  Not conducting sufficient testing programs and studies to determine Roundup®'s carcinogenic properties even after Defendant had knowledge that Roundup® is, was, or could be carcinogenic;

e.  Failing to conduct sufficient testing programs to determine: (i) the safety of "inert" ingredients and/or adjuvants contained within Roundup®, (ii) the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, (iii) whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and (iv) whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn Ms. Moreno, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

g.  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup®;

h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

i.  Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

j.  Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.  Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup® in a manner which was dangerous to its users;

m.  Negligently manufacturing Roundup® in a manner which was dangerous to its users;

n.  Negligently formulating Roundup® in a manner which was danger to its users;

o.  Concealing information from Ms. Moreno while knowing that Roundup® was unsafe, dangerous and/or non-conforming with EPA regulations;

p.  Improperly concealing and/or misrepresenting information concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides; and

q.  Negligently selling Roundup® with a false and misleading label.

74.    Defendant under-reported, underestimated and downplayed the serious dangers of Roundup®, and negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such a table salt and other forms of herbicides.

75.    Defendant was negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and selling of Roundup® in that they:

a.  Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

b.  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

c.  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

d.  Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

e.  Failed to warn Ms. Moreno of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects including, but not limited to, the development of non-Hodgkin's lymphoma;

f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®;

g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

h.  Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity; and/or

i.  Were otherwise careless and/or negligent.

76.    Despite the fact that Defendant knew or should have known that Roundup® could cause unreasonably dangerous side effects, Defendant continued and continue to market, manufacture, distribute, and/or sell Roundup® to consumers, including Ms. Moreno.

77.   Defendant knew or should have known that consumers such as Ms. Moreno would foreseeably suffer injury and death as a result of Defendant's failure to exercise ordinary care, as set forth above.

78.   Defendant's violations of law and/or negligence were the proximate cause of Ms. Moreno's injuries, pain and suffering, harm, economic loss, and death.

79.   As a result of the foregoing acts and omissions, Ms. Moreno developed non-Hodgkin's lymphoma, from which she passed away.  Prior to her death from non-Hodgkin's lymphoma, and as a result of Defendant's negligence, Ms. Moreno endured pain, suffering, mental anguish, diminished enjoyment of life, lost earnings, and incurred financial expenses for hospitalization and medical care.

**SECOND CAUSE OF ACTION**

**Wrongful Death Action Sounding in Negligence by Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez against Defendant**

**(Cal. Civ. Proc. Code § 377.60)**

80.   The foregoing allegations are re-alleged and incorporated herein by reference.

81.   As described above, Defendant's negligence resulted in Ms. Moreno contracting non-Hodgkin's lymphoma, a disease that she passed away from at the age of 57, after enduring considerable pain and suffering.

82.   Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez each suffered considerable pain, suffering, and emotional distress from having to watch their mother suffer, deteriorate, and die prematurely.

83.   In addition, Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez, sustained damages resulting from the loss of love, affection, society, service,

comfort, support, right of support, expectations of future support and counseling, companionship, solace and mental support, as well as other benefits and assistance of Estela Moreno.

84.     Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez seek to recover damages they suffered on account of Estela Moreno's wrongful death damages pursuant to CCP Section 377.60.

**THIRD CAUSE OF ACTION**

**Survival Action Sounding in Strict Liability Design Defect by Ariana Lopez in her capacity as Representative of the Estate of Estela Moreno against Defendant (Cal. Civ. Proc. Code § 377.30 et seq.)**

85.     The foregoing allegations are re-alleged and incorporated herein by reference.

86.     At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup® as hereinabove described that was used by Ms. Moreno.

87.     Defendant's Roundup® product was expected to and did reach the usual consumers, handlers and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed and marketed by the Defendant.  At those times, Roundup® was in an unsafe, defective and inherently dangerous condition, which was dangerous to users, and in particular, Ms. Moreno herein.

88.     The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the

foreseeable risks exceeded the benefits associated with the design or formulation of Roundup®.

89.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

90.    At all times herein mentioned, Roundup® was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Roundup® was defective in the following ways:

a.  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d.  Defendant did not sufficiently test, investigate, or study its Roundup® products.

e.   Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® could result in cancer and other severe illnesses and injuries.

g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

91.   Defendant knew or should have known that at all times herein mentioned its Roundup® product was in a defective condition and was and is inherently dangerous and unsafe.

92.   Ms. Moreno was exposed to Defendant's Roundup® as described above, without knowledge of Roundup®'s dangerous characteristics.

93.   At the time of Ms. Moreno's use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended as a broad-spectrum herbicide.

94.   Defendant with this knowledge voluntarily designed its Roundup® with a dangerous condition for use by the public, and in particular Ms. Moreno.

95.   Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.  Defendant created a product that was and is unreasonably dangerous for its normal, intended use.  Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable and established health risks inherent with its normal intended use.

96.     The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was manufactured defectively in that Roundup® left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

97.     The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant reached their intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup® was manufactured.

98.     Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product, which created an unreasonable risk to the health of consumers and to Ms. Moreno in particular, and Defendant is therefore strictly liable for the injuries sustained by Ms. Moreno.  Ms. Moreno could not, by the exercise of reasonable care, have discovered Roundup®'s defects herein mentioned or perceived its danger.

99.     By reason of the foregoing, the Defendant has become strictly liable to Ms. Moreno for the manufacturing, marketing, promoting, distributing and selling of a defective product, Roundup®.  Defendant's defective design of Roundup® amounts to willful, wanton and/or reckless conduct by Defendant.

100.    As a result of the foregoing acts and omissions, Ms. Moreno developed non-Hodgkin's lymphoma from which she passed away.  Prior to her death from non-Hodgkin's lymphoma, and as a result of Defendant's acts and omissions, Ms. Moreno endured pain, suffering, mental anguish, diminished enjoyment of life, lost earnings, and incurred financial expenses for hospitalization and medical care.

**FOURTH CAUSE OF ACTION**

**Wrongful Death Action Sounding in Strict Liability Design Defect by Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez against Defendant**

**(Cal. Civ. Proc. Code § 377.60)**

101.    The foregoing allegations are re-alleged and incorporated herein by reference.

102.    As described above, Defendant's should be held strictly liable for having caused Ms. Moreno to contract non-Hodgkin's lymphoma, a disease that she passed away from at the age of 57, after enduring considerable pain and suffering.

103.    Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez each suffered considerable pain, suffering, and emotional distress from having to watch their mother suffer, deteriorate, and die prematurely.

104.    In addition, Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez, sustained damages resulting from the loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling, companionship, solace and mental support, as well as other benefits and assistance of Estela Moreno.

105.    Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez seek to recover damages they suffered on account of Estela Moreno's wrongful death damages pursuant to CCP Section 377.60.

**FIFTH CAUSE OF ACTION**

**Survival Action Sounding in Strict Liability for Failure to Warn by Ariana Lopez in her capacity as Representative of the Estate of Estela Moreno against Defendant (Cal. Civ. Proc. Code § 377.30 et seq.)**

106.    The allegations set forth in paragraphs 1 through 107 are re-alleged and incorporated herein by reference.

107.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup®, and through that conduct, has knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge that it reaches consumers such as Ms. Moreno who are exposed to it through ordinary and reasonably foreseeable uses.

108.    Defendant did in fact sell, distribute, supply, manufacture and/or promote Roundup® to Ms. Moreno. Additionally, Defendant expected the Roundup® product that it was selling, distributing, supplying, manufacturing, and/or promoting to reach consumers, including Ms. Moreno, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

109.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup®, because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.  At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by Defendant and at the time Ms. Moreno was exposed to the product. The defective condition of Roundup® was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and

side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

110.   Roundup® did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed. Defendant could have amended the label of Roundup® to provide additional warnings.

111.   This defect caused serious injury to Ms. Moreno, who used Roundup® in its intended and foreseeable manner.  At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

112.   Defendant failed to warn of the nature and scope of the side effects associated with Roundup®, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of non-Hodgkin's lymphoma.  Defendant was aware of the probable consequences of the aforesaid conduct.

113.   Despite the fact that Defendant knew or should have known that Roundup® caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing non-Hodgkin's lymphoma from Roundup® exposure, even though this side effect was known to Defendant or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Ms. Moreno.  At the time of exposure, Ms. Moreno could not have reasonably discovered any defect in Roundup® prior through the exercise of reasonable care.

114.     Defendant, as the manufacturer and/or distributor of the subject product is held to the level of knowledge of an expert in the field.  Ms. Moreno reasonably relied upon the skill, superior knowledge and judgment of Defendant.  Had Defendant properly disclosed the risks associated with Roundup®, Ms. Moreno would have avoided the risk of non-Hodgkin's lymphoma by not using Roundup®.

115.     The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Ms. Moreno, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading and which failed to communicate accurately or adequately the comparative severity, duration  and extent of the risk of injuries associated with use and/or exposure to Roundup® and glyphosate, continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate. To this day, Defendant has failed to adequately warn of the true risks of Plaintiffs injuries associated with the use of and exposure to Roundup®.  As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Ms. Moreno.

116.     As a result of the foregoing acts and omissions, Ms. Moreno developed non-Hodgkin's lymphoma from which she passed away.  Prior to her death from non-Hodgkin's lymphoma, and as a result of Defendant's acts and omissions, Ms. Moreno endured pain, suffering, mental anguish, diminished enjoyment of life, lost earnings, and

incurred financial expenses for hospitalization and medical care.

## SIXTH CAUSE OF ACTION

**Wrongful Death Action Sounding in Strict Liability for Failure to Warn by Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez against Defendant**

**(Cal. Civ. Proc. Code § 377.60)**

117.　The foregoing allegations are re-alleged and incorporated herein by reference.

118.　As described above, Defendant's should be held strictly liable for having failed to warn Ms. Moreno of the dangers of Roundup®, which caused Ms. Moreno to contract non-Hodgkin's lymphoma, a disease that she passed away from at the age of 57, after enduring considerable pain and suffering.

119.　Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez each suffered considerable pain, suffering, and emotional distress from having to watch their mother suffer, deteriorate, and die prematurely.

120.　In addition, Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez, sustained damages resulting from the loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling, companionship, solace and mental support, as well as other benefits and assistance of Estela Moreno.

121.　Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez seek to recover damages they suffered on account of Estela Moreno's wrongful death damages pursuant to CCP Section 377.60.

**SEVENTH CAUSE OF ACTION**

**Survival Action for Breach of Express Warranty by Ariana Lopez in her capacity as Representative of the Estate of Estela Moreno against Defendant**

**(Cal. Civ. Proc. Code § 377.30 et seq.)**

122.    The foregoing allegations are re-alleged and incorporated herein by reference.

123.    At all times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup® as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

124.    At the time Defendant marketed, sold and distributed Roundup® for use by Ms. Moreno, Defendant knew of Roundup®'s intended use and expressly warranted the product to be of merchantable quality and safe and fit for this use.

125.    Defendant expressly represented and warranted to Ms. Moreno and users of Roundup®, the agricultural community and/or the EPA that Roundup® was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used. These representations and warranties were false, misleading and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

126.    Ms. Moreno and/or the EPA did rely on said express warranty of merchantability of fitness for particular use and purpose.

127.    Roundup® was injected into the stream of commerce by the Defendant in a defective, unsafe and inherently dangerous condition, and the product's materials were expected to and did reach users, handlers and persons coming into contact with said

products without substantial change in the condition in which they were sold.  Defendant breached the aforesaid express warranties, as their herbicide Roundup® was not fit for its intended purposes and uses.

128.   As a result of the foregoing acts and omissions, Ms. Moreno developed non-Hodgkin's lymphoma from which she passed away.  Prior to her death from non-Hodgkin's lymphoma, and as a result of Defendant's acts and omissions, Ms. Moreno endured pain, suffering, mental anguish, diminished enjoyment of life, lost earnings, and incurred financial expenses for hospitalization and medical care.

**EIGHTH CAUSE OF ACTION**

**Wrongful Death Action for Breach of Express Warranty by Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez against Defendant**

**(Cal. Civ. Proc. Code § 377.60)**

129.   The foregoing allegations are re-alleged and incorporated herein by reference.

130.   As described above, Defendant breached the express warranty of merchantability of fitness for particular use and purpose by selling a product that was dangerous and caused Ms. Moreno to contract non-Hodgkin's lymphoma, a disease that she passed away from at the age of 57, after enduring considerable pain and suffering.

131.   Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez each suffered considerable pain, suffering, and emotional distress from having to watch their mother suffer, deteriorate, and die prematurely.

132.   In addition, Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez, sustained damages resulting from the loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling,

companionship, solace and mental support, as well as other benefits and assistance of Estela Moreno.

133.    Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez seek to recover damages they suffered on account of Estela Moreno's wrongful death damages pursuant to CCP Section 377.60.

**NINTH CAUSE OF ACTION**

**Survival Action for Breach of Implied Warranty by Ariana Lopez in her capacity as Representative of the Estate of Estela Moreno against Defendant**

**(Cal. Civ. Proc. Code § 377.30 et seq.)**

134.    The foregoing allegations are re-alleged and incorporated herein by reference.

135.    At all times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup® as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

136.    At the time Defendant marketed, sold, and distributed Roundup® for use by Ms. Moreno, Defendant knew of Roundup®'s intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

137.    Defendant impliedly represented and warranted to Ms. Moreno and users of Roundup®, the agricultural community and/or the EPA that Roundup® was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used. These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

138.    Ms. Moreno and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.  Ms. Moreno reasonably relied upon the skill and judgment of Defendant as to whether Roundup® was of merchantable quality and safe and fit for its intended use.

139.    Roundup® was injected into the stream of commerce by the Defendant in a defective, unsafe and inherently dangerous condition, and the product's materials were expected to and did reach users, handlers and persons coming into contact with said products without substantial change in the condition in which they were sold.  Defendant breached the aforesaid implied warranties, as the Roundup® product was not fit for its intended purposes and uses.

140.    As a result of the foregoing acts and omissions by Defendant, Ms. Moreno developed non-Hodgkin's lymphoma from which she passed away.  Prior to her death from non-Hodgkin's lymphoma, and as a result of Defendant's acts and omissions, Ms. Moreno endured pain, suffering, mental anguish, diminished enjoyment of life, lost earnings, and incurred financial expenses for hospitalization and medical care.

## TENTH CAUSE OF ACTION

**Wrongful Death Action for Breach of Implied Warranty by Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez against Defendant**

**(Cal. Civ. Proc. Code § 377.60)**

141.    The foregoing allegations are re-alleged and incorporated herein by reference.

142.    As described above, Defendant breached the implied warranty of merchantability of fitness for particular use and purpose by selling a product that was dangerous and caused Ms. Moreno to contract non-Hodgkin's lymphoma, a disease that

she passed away from at the age of 57, after enduring considerable pain and suffering.

143.    Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez each suffered considerable pain, suffering, and emotional distress from having to watch their mother suffer, deteriorate, and die prematurely.

144.    In addition, Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez, sustained damages resulting from the loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling, companionship, solace and mental support, as well as other benefits and assistance of Estela Moreno.

145.    Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez seek to recover damages they suffered on account of Estela Moreno's wrongful death damages pursuant to CCP Section 377.60.

## ELEVENTH CAUSE OF ACTION

**Survival Action for Fraud by Ariana Lopez in her capacity as Representative of the**

**Estate of Estela Moreno against Defendant**

**(Cal. Civ. Proc. Code § 377.30 et seq.)**

146.    The foregoing allegations are re-alleged and incorporated herein by reference.

147.    Defendant Monsanto defrauded Ms. Moreno by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.  As a result of these misrepresentations, Ms. Moreno used Roundup® on a regular basis for more than a decade.  This use caused Ms. Moreno to contract non-Hodgkin's lymphoma, a disease that she passed away from at the age of 57, after enduring considerable pain and suffering.

148.    Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

149.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. §156.l0(a).

150.    Ms. Moreno relied on Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient, glyphosate, in deciding whether to purchase and/or use the product. Plaintiffs did not know, nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

151.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from

**COMPLAINT**
41

disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

152. When Defendant made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public and with the intent of inducing the public to purchase and use Roundup®.

153. Defendant made these misrepresentations and/or material omissions with malicious, fraudulent, and/or oppressive intent toward Ms. Moreno and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted, and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Ms. Moreno and others which proximately caused the injuries set forth herein.

**TWELFTH CAUSE OF ACTION**

**Wrongful Death Action for Fraud by Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez against Defendant**

**(Cal. Civ. Proc. Code § 377.60)**

154. The foregoing allegations are re-alleged and incorporated herein by reference.

155. As described above, Defendant defrauded Ms. Moreno by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of

**COMPLAINT**
42

cancer. As a result of these misrepresentations, Ms. Moreno used Roundup® on a regular basis for more than a decade.  This use caused Ms. Moreno to contract non-Hodgkin's lymphoma, a disease that she passed away from at the age of 57, after enduring considerable pain and suffering.

156.   Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez each suffered considerable pain, suffering, and emotional distress from having to watch their mother suffer, deteriorate, and die prematurely.

157.   In addition, Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez, sustained damages resulting from the loss of love, affection, society, service, comfort, support, right of support, expectations of future support and counseling, companionship, solace, and mental support, as well as other benefits and assistance of Estela Moreno.

158.   Plaintiffs Ariana Lopez, Gerado Lopez-Moreno, and Omar Alonso Hernandez seek to recover damages they suffered on account of Estela Moreno's wrongful death damages pursuant to CCP Section 377.60.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

a.   For general and special damages in excess of $75,000, according to proof;

b.   Awarding compensatory damages in excess of in excess of $75,000, including, but not limited to pain, suffering, emotional distress, and other non-- economic damages in an amount to be determined at trial of this action;

c.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in excess of $75,000 in an amount to be determined at trial of this action;

d.  Punitive and/or exemplary damages for the wanton, willful, fraudulent and reckless acts of the Defendant in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

e.  Attorneys' fees to the extent permitted by law;

f.  For pre-judgment and post-judgment interest on all damages awarded; and

g.  For such other and further relief as the Court may deem just and proper.

Dated: March 10, 2022

*Daniel E. Sobelsohn*
_____
Daniel E. Sobelsohn
THE SOBELSOHN LAW FIRM
16027 Ventura Blvd., Suite 502
Encino, CA 91436
Tel: (818) 992-7800
Fax: (818) 530-4342

Attorneys for Plaintiffs

**JURY DEMAND**

Additionally, the Plaintiffs demand a trial of this matter by jury.

Dated: March 10, 2022

*Daniel E. Sobelsohn*
_____
Daniel E. Sobelsohn
THE SOBELSOHN LAW FIRM
16027 Ventura Blvd.
Suite 502
Encino, CA 91436
Tel: (818) 992-7800
Fax: (818) 530-4342

Attorneys for Plaintiffs